Okay, we'll move to our second argument of the morning. It's in case number 23-1091, Gary Hicks v. Illinois Department of Corrections and others. Okay, Mr. Baker, good morning. We have two separate claims in our case. I want to start by focusing on the First Amendment claim, if I could. The district court, first of all, this court has found that there are two separate ways in a public employee First Amendment claim for us to get to the pickering analysis. The district court rejected both of those ways and said that Mr. Hicks' statements were not matters of public concern and that they also didn't make it under the other alternative method of getting there. We outlined a very detailed argument to this court as to why we believe that both of those analyses were incorrect. Defendants in their response don't make much of an argument saying that these are not matters of public concern or First Amendment speech. So unless there are specific questions about that, I'd like to move on to the pickering analysis if that's acceptable to the court. The pickering balancing has been done over and over again in this circuit and throughout the country. But what this court has explained is that it is essentially an affirmative defense by an employer. An employer has the burden of proof on the pickering balancing test. They have to lay out the evidence as they saw it, why they made the decisions they did, and why their concerns outweighed the interest of the employee in speaking. Now, this court has gone even further than that, and particularly in Gustafson. We can't, as lawyers and as a court, come back and engage in judicial speculation as to justifications that could have been offered by an employer as to why they did what they did. We have to rely upon what they actually said, what was their justification. So you can have a case where potentially there is a viable justification, but that still doesn't mean that we short-circuit the pickering analysis. We have to engage in pickering balancing, and that requires the employer to come forward and articulate their justifications. Here, the justifications that are offered actually by the employer, by their interrogatory answers and by their answers and depositions, were quite limited. What we had was a newspaper article that was run, and that launched an investigation. And again, that investigation was proper. That's what should happen under those circumstances to find out what had occurred. Now, mind you, these posts that we are talking about had all been made months before. There's no evidence that anything ever happened. There was any problem in the work environment, any concerns of other employees. Nobody from the public came. In fact, the warden, who I think is actually a friend of Mr. Hicks' on Facebook, didn't even know the posts were out there. Why isn't the media uncovering this and writing a story about it not considered the public? Well, they are, but what I am suggesting is that when we are talking about the balancing and making the argument that it impairs the efficiencies of the internal operations of the department, that it impacts the chain of command, okay, we had six months to say that didn't really happen here. So we can't just throw that out there as a justification because it didn't happen. So when the director makes the statement, well, it just suggests that Mr. Hicks is not going to treat Muslims fairly. Again, there's no basis to that other than just pure speculation. We had an investigation that certainly didn't find that that was a legitimate concern. We had nothing that happened in the interim. We had nobody internally who complained. We had no prisoner who complained. The complaint that was made came from the media. The media wrote an article that was factually erroneous, and so once that article came out, we have an investigation. The conclusion on the investigation, which is why they made the decision that they made, is based on direct evidence, the charge correctional sergeant Gary O. Hicks violated conduct of individual is substantiated. Hicks admitted to making the post to or from his Facebook account in which he shared memes to reflect his personal views on topics of a political or religious nature. Mr. Baker, let me ask you this. Is public confidence in the operation and integrity of the Department of Corrections a relevant Pickering consideration? Yes. Okay. So the stated reason that's given here is that the Facebook posts reflected poorly upon the department and its mission, correct? That's the stated reason. Okay. The extent of the stated reason, I believe. No, I mean, I think you're literally correct about that. It's not, at least in the document that records the reason for the, that's it. There's no further, you know, explanation that's given for that. But in my mind, the moment that I change this fact pattern to say they were racially derogatory posts, the case seems simple, like instantly simple. Absolutely. He could be disciplined for 10 days, maybe terminated. Okay. Then you think, why is it really different? Because these are very derogatory, incendiary statements about members of the Muslim faith and about homosexuals. So about sexual orientation. So is it really meaningfully different than a simple example? Well, I suppose I disagree on a couple of points. First of all, there has to be an analysis made under Pickering, all right? They have to make the analysis. And so the district or the defendants didn't do that here. But going forward and answering your question specifically, I think it's based on a flawed premise. I don't think that these are outrageous comments. I don't think that they are objectively offensive comments. We identified all of these comments. These were posts that literally parroted things that the President of the United States was saying. I know you want to fight that battle. I mean, good luck. Well, particularly because the Supreme Court, I'm looking at the Supreme Court in Waters that said courts must look to the facts as the employer reasonably found them to be, not as viewed by an employee or a court or a jury. So I do take your point that Mr. Hicks does not think that they are terribly offensive, but the IDOC did. Well, I don't know that the IDOC did think that. They don't say that they find them to be terribly offensive. They say they reflect poorly upon the department. I've been looking at one of them. Homosexuality is a sin. Allah is not God. Which is a statement of Christian belief. And again, that's a religious statement. If there was some evidence there that they reasonably thought that impacted the efficiency of the department, but it didn't. Well, let me ask you about that, too, because, you know, our court in Lulowski has said that a government employer is allowed to consider the potential disruptiveness of employee speech. The employee isn't required to wait and see, does it happen? Well, there's no question. So why this insistence that we look only at whether things fell apart at the IDOC as a result of these posts? Well, that's true. And the cases that have done that have outlined an investigation where there is a finding that there has been or a reasonable belief that there was going to be a fallout. First of all, they don't say in their conclusion, we find this is going to have a negative impact internally. That's something that has come up in this litigation. But second of all, in those cases, these were instances where individuals and agencies acted immediately, immediately to investigate something that was said and done. And based on that, they predicted that there could be an outcry or a problem internally down the road. These statements had been posted for three months to six months before there was ever any sort of an investigation. So the reasonableness of the prediction falls apart at that point when you've had all this time to see, is there anything that has happened internally? It's publicly exposed, though. There's an intervening fact, right? There's an article in the Sun-Times that publicly exposes this. Correct. But again, when we talk about the internal – and the Sun-Times article is factually flawed in so many different respects. It identifies Mr. Hicks as being involved in a lawsuit. It says that he made statements. It's not flawed as to the posts. It's not flawed as to all of the posts. To some of the posts, it is correct. So when the Sun-Times article runs, it seems to me that the department becomes quite – reasonably becomes concerned. Yes. I think that's correct, and I think that they do an investigation. And it's immediate because you said here we had a problem of immediacy. It is immediate unless it's exposed. Because the prior arguments are suggesting they're under a duty to investigate Facebook posts or something. No, I'm not suggesting that. That's not at all what I've suggested, Your Honor. What I've suggested is the case law that you are referencing and the court is referencing are instances that have happened many, many months in the past – or, excuse me, immediately. These are many months in the past, and so there's an opportunity to see has there been any internal problem as far as people reporting to him. So there are just differences. That's all I'm trying to suggest. Okay. And I believe that the Sun-Times article, as I stated before, it is perfectly appropriate once that article came out for them to do an investigation. They should do an investigation. But in doing that investigation, they need to figure out how did this impact? What was the – what is it happened? And so what we get instead of an analysis of what happened and how it was – how it harmed the institution or how – what reasonable concerns they have, all we get is a conclusion to say, well, it harms – it reflects negatively on the department, and that is problematic because that allows any defendant ever to simply say, well, you know, we find in our view that this reflects negatively upon the department. That gives carte blanche for someone to make that conclusion and say, well, that's their conclusion and that's fine. No, it's – I mean you can challenge it. It's still – it's going to ultimately be subject to judicial review. It's not entitled to carte blanche deference or anything like that. But that's the argument. So if his posts were, I've lost confidence in the President of the United States. I think the American people ought to elect a new president. We wouldn't be here. We would not – there's absolutely no way we would be here. Well, according to the director of the department, anytime somebody says something that one person in the state of Illinois finds objectively – Well, I – Subjectively offensive. We'll see if Mr. Sheffield agrees with you in a minute. I'd be shocked if he does. Well, I think that the district court would have handled the case differently. I agree with that point, but I'm not so sure I agree with – based on what the director stated. When he's making derogatory comments about people's sexual orientation and members of the Muslim faith, the department became concerned and acted upon it. And if you change this fact pattern to be about race, this seems like a snap of the finger. Absolutely, he could be suspended for 10 days. And I just don't know what differentiates it. As I've said – Because you can't possibly want to take the position that the Department of Corrections would not be concerned about a racist correctional officer. No, I would never take that. Right, you would never take that. So what differentiates it from this case? But I wouldn't take it – I don't think that there's any argument here that he was anti-homosexual or that he was anti – that's not a finding in here. There's never been a finding in that investigation. What do you mean he's not? How do you square that with what he wrote on Facebook? He posted a meme talking about what his religious beliefs were. I'm not sure there even needs to be a finding, you know, that he's anti-Muslim or homophobic or any of that. I think Pickering asks us to consider what the employer's reasonable reactions or concerns or fears might be and whether they outweigh a plaintiff's First Amendment concerns. So I don't know if we need to even push to is Mr. Hicks this or that. We have to look at the balancing, and it's balancing that courts are engaged in. It's not balancing we require of the employer. Well, I think that an employer has an obligation to come forward with an explanation of why they did what they did. Well, all they did is read his own words. That's true. But then we may just simply come up to the conclusion, well, we find – we make this carte blanche. You may be right. They could have said more. Well, I think they have an obligation to say more and say why this impacts. And it's not just – and I realize my time is – Go ahead. You're okay. Keep going. But I ask these questions during discovery. I ask these questions in interrogatories. How specifically did this impact the department? And they could never give anything other than just generalizations. It creates a bad impression. And, you know, I believe that pickering requires more if you are going to restrain somebody's First Amendment rights to speak out on matters that are out there. So I do see my time is up. No, no. We'll give you a couple minutes on rebuttal. We asked you a lot of questions, and we understand your point. Thank you. Thank you. You're quite welcome. Mr. Sheffield, good morning. Good morning, Your Honors. Jonathan Sheffield representing Appalese. This Court should affirm the entry of summary judgment on Hicks' speech and due process claims because they failed on both the merits and qualified immunity grounds. On the speech claim, the district court's pickering analysis was correct. Defendant's burden was not particularly onerous considering that Hicks' speech, the value in it, was relatively low. Mr. Sheffield, at the outset, can we move aside one point? It doesn't seem from your brief that you're all that eager to defend the district court's conclusion that these posts were not on matters of public concern. Your Honors, in the interest of meeting the word limit, we decided to focus on the pickering balancing. It probably had more to do with the content of the argument than the word limit. Well, Your Honors, for purposes of this appeal, we do concede that Hicks' speech touched on a matter of public concern in some limited sense and that this is not like Harnisch-Feger or, excuse me, not like other cases where the employee deliberately traded on their public concern. So it's a pickering balancing case. Exactly, Your Honor. Okay, good. So to the point that Your Honors were asking, the defendants met their burden to show that their interest outweighed Hicks' interest in the speech considering the content of that speech, context of it, and the harms that befell from it. First, the content. The defendants reasonably construed Hicks' Facebook posts as attacks on government authority and minority groups, whose members included staff and inmates of the department. And that was the reporter's view. And even though the warden didn't see these posts, that is the content. And the contexts were derogatory posts shared on a Facebook account that was public, listed the department as Hicks' employer, and disclosed his position as correctional sergeant. It even had a picture of him from not so long before the post. And finally, the harm, which my colleague on the other side spent much time discussing. Hicks' speech caused the department harm externally and threatened harm internally. And that is enough. His derogatory posts on a public Facebook page listing his government employer and position permitted community members, including reporter Horner and her readers, to be reasonably concerned in Hicks' fairness as a supervisor of staff and inmates at Robinson. And this public concern is harm to the department's reputation, as my colleague on the other side appeared to recognize. I take Mr. Baker's point to be this morning that, sure, you all may say all that now, but the written communication he got about why he was being suspended for 10 days said a whole lot less. And so I'd like your response to that. Thank you, Your Honor. Hicks advocates for a rule requiring employers to write down disciplinary justifications and engage in a pickering balancing that just has not been implied by this circuit's case law or any other circuit's case law. Instead, courts have recognized that public employers are busy and need to be able to make employment decisions quickly. No case holds that the employer's First Amendment justifications for discipline cannot be offered in discovery. And specifically in Connick and Gustafsson, they make clear the opposite, that the department's explanation, what it had in mind at the time, that's what matters. This isn't rational basis review. Attorneys in courts can't add to those justifications. But the department here was very clear. The investigator's report noted the public harm and found potential violations. Those went to a hearing. At the hearing, Hicks and others testified. And the hearing officer found a violation of the department's rules that prohibited off-duty conduct that might reflect unfavorably on the department or impair its operations or was unbecoming of an officer. And so that is the justification for Hicks' discipline. It is a violation of a broad rule. And in discovery, the director was asked to expound upon that, as is permitted. And in expounding upon why these statements were a violation of the rule, that's when the director explained the institutional concerns, the internal concerns that the department had in addition to the external concerns. When you say the director, is that Mr. Jeffries? Yes, Your Honor. Okay. Can I interrupt you on one point there? Yes. All right, you can go. One of the things that I had a little bit of trouble with is figuring out what role everybody played. And Jeffries himself in his deposition said he wasn't involved in this at all. And I'm looking right at his deposition testimony on page 24. I didn't have any involvement at all. So why isn't that kind of post hoc by him? Any explanation he would offer. He didn't have anything to do with it. He's being asked about it in a deposition, just like he's reacting after the fact. Well, you want me to come up with a reason for why? He was asked to explain. But he wasn't a real-time participant by his own admission. He wasn't involved in the disciplinary proceedings for Hicks in particular, but he was aware of them at the time. In fact, the next day after a foreigner contacted the department, he sent an email to all staff, noting that staff should refrain from derogatory posts on their social media and that it would be a violation of these standards. So although the director was not part of the disciplinary decision here directly, he represents the department, and the department explained its position as to why this was a violation of its rules. And to be clear, the investigation itself, as my colleague on the other side noted, was necessary and proper. And that costs the employer as well. So if posts like this are permitted, the employer has to undertake these investigations, and it becomes difficult. But then also we explained that the public harm to this also exposed the department to potential liability, as made clear in litigation that was going on at the time involving inmate Tay,  using officer statements similar to Hicks. And so the department was very concerned with its employees making public statements, connecting themselves on their social media profile to the employer, to the department, and even listing their position. You don't take the position, do you, that someone that affiliates on their Facebook page or any other social media account with the department and then says, I've lost confidence in the President of the United States. Does that violate the policy? Your Honor, that is, our position is not as broad as that. That would be a violation of the policy. That would be much closer to Rankin, where the Supreme Court said that expressing that sort of hostility toward the President is insufficient. But here we have derogatory posts that, although they're not based on race, are based on national origin and religion, and those are protected. Status is just the same as race. And so there is that concern as well. So these are not new justifications. These justifications were offered by the department's investigator and hearing officer and the director. And I also want to note that it's not speculative for the director to say that employees who use derogatory racist or national Islamophobic or other comments might harm internal operations if staff and inmates become aware of those posts. And the fact that staff and inmates did not become aware of the post in the very limited time that between the article's publication, investigation, and then discipline, is really a matter that should not be held against the department in the Pickering balancing. This happened very quickly. The department learned about these posts in September. The next day started an investigation. And the follow-up from Hicks' speech was still fresh and occurring. And Hicks looks to the period after his discipline, November of 2019, possibly until his retirement in 2021, to support that there's no disharmony that materialized. Yet the lack of disharmony might have been because of the discipline itself. And, of course, the employer did not have the benefit of hindsight knowing in November of 2019 that there wouldn't be fallout, right? And that's not the standard. The argument that harm to the public image isn't enough is really an argument that other harm is necessary here and that the employer's concerns were not reasonable predictions of disharmony. In an institution, a paramilitary institution, that is responsible for providing a safe place for staff and inmates through many means, including making sure there is no appearance of bias among staff members. Let me just touch on the vagueness argument, and then you can go back wherever you were going. You know, the department later adopts a social media policy. Is that indication that the administrative directives weren't clear enough? They didn't provide enough notice to Hicks that this kind of post could get him into trouble? Your Honor, the department's decision to later promulgate a social media policy has no bearing on whether those standards were sufficient to place Hicks on notice in the first place. Again, that standard, the vagueness standard, is not the same standard that applies when the government is making laws that apply to the public. When the government is acting as an employer, it must necessarily use broad terms like any other employer. And they're acceptable because, excuse me, if they convey adequate warning to reasonable employees as to a sufficiently defined range of inappropriate conduct. And nothing about the promulgation of a social media policy made it unclear to Hicks at the time that he acted that making derogatory statements based on people's religion, national origin, and government authority would not be conduct on becoming of an officer or potentially harm the department or its operations or its reputation. So also, of course, the director did not testify that the standard is violated any time anyone in Illinois is offended. The director's testimony is at most acknowledging that perhaps an investigation would be warranted in circumstances where the department receives complaints. And that is what has happened in this case and other cases where a public employer might receive a public complaint and undertakes an investigation to determine whether its standards have been violated. So to be clear, allowing a supervisor like Hicks to continue sharing derogatory posts unaddressed would not only undermine that perception of fairness that the community held, but also it is reasonably predictable that staff and inmates who became aware of those posts eventually, whether it's these or future ones, that would increase tension among employees and prisoners, thereby threatening discipline, safety, and security within Robinson. Without the ability to discipline Hicks, the department would have been at his mercy for additional similar posts made under similarly harmful circumstances. And of course, Your Honors, the speech interest in these, as we explained, is relatively low because these posts, if they even touched upon matters of public concern, were only in a limited sense, considering that these were not statements like wearing a MAGA hat, but were instead, and of course, instead they were statements degrading politicians and others based on stereotypes about religion, national origin, sexual orientation. And so those are, of course, at odds with the department's mission to serve its penological function free of discrimination. And of course, the fact that he did not address matters within his informed view also contributes to the department's argument that there was relatively low value and interest in this speech. Because, of course, the department is entitled to deference in its decision. Under the Supreme Court's decision, or excuse me, the department is entitled to deference in its view of the speech as made clear by the Supreme Court's decision in Waters. And looking at the speech as potentially derogatory as it was reported by the reporter was reasonable here, as was the investigation. So unless Your Honors have any further questions. Hearing none, thank you, Mr. Sheffield. Thank you. Mr. Baker, as promised, we'll give you a couple minutes. Thank you for your indulgence, Your Honor. I do greatly appreciate that. I just wanted to respond to a couple of points that were addressed by Mr. Sheffield. And to hammer in a question you've asked, Your Honor, about politics and what is said. You know, I asked specifically Mr. Eilers, who I think was probably the ultimate decision maker, do you believe in general that Mr. Hicks has a right to express his political opinions on Facebook? Answer, not on social media, no, while he's employed in the department. So, you know, that is the department's philosophy. And we go back and we look at these – to what you raised, Your Honor, about the lack of clarity. I cited in detail the director's testimony where I asked him, if I put one out and posted on Facebook, all Muslims are bad, would that violate the department's policy? And he said he couldn't make that determination. There would have to be an investigation first to see if it violated the policy. And my point to that is, if the director of the department doesn't know if my making that statement violates the policy, how am I, as a reasonable employee, supposed to know that that would violate the policy? And so that's the point that I was trying to get at there. I also – you know, I asked in discovery over and over again why it is or how it is that this impacted the department. And, you know, so they didn't provide it initially, but they didn't provide really anything in discovery either. When I asked, explain in detail how posting memes that led to Hicks's suspension impacted the operations of the department, and this is on page 23 of our brief, 24 of our brief, nowhere does it say it impacted our public image. It made the outside public have a concern about us. It talked about Muslims and they said the memes shared by plaintiff reflect an inability for him to carry out the duties required equally and regardless of religious affiliation of others. That's what their justification is, which just isn't true. And so I suppose, and I do appreciate the extra time, at the end of the day, picturing requires us not to sit here and speculate as to reasons why they could have taken the actions they did. They have not outlined their reasons, so they fail the balancing test. Thank you, and we ask that you leave first. Thank you, Mr. Baker. Mr. Sheffield, thanks to you. The court will take the appeal under advisement.